UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN MORRISON, | ) Case No. CV 19-1961-JGB (JPR) |
| Plaintiff, | ) ORDER ACCEPTING FINDINGS AND |
| v. | ) RECOMMENDATIONS OF U.S. |
| ALVARO RAMOS et al., | ) MAGISTRATE JUDGE |
| Defendants. | ) |

The Court has reviewed de novo the records on file and Report and Recommendation of U.S. Magistrate Judge, which recommends that Defendants' summary-judgment motion be granted except as to the state-law claims, which should be dismissed without prejudice, and Plaintiff's summary-judgment motion be denied. See 28 U.S.C. § 636. On May 10, 2022, Plaintiff objected to portions of the R. & R.; Defendants didn't respond.

In 47 pages of objections, Plaintiff has included no record citations other than when quoting (without quotation marks) the R. & R., making it virtually impossible for the Court to assess his arguments. See Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (noting that district court need not "scour the record in search of a genuine issue of triable fact" (citation omitted));

1

Fed. R. Civ. P. 56(c)(3) ("[C]ourt need consider only the cited materials[.]"). At any rate, he mostly reargues points made in his summary-judgment motion, Opposition to Defendants' motion, and Reply, which the Magistrate Judge already considered and appropriately rejected. Only a few warrant discussion.

Plaintiff doesn't challenge the Magistrate Judge's finding that his malicious-prosecution claim fails or that his state-law claims should be dismissed. Nor does he dispute that the preliminary-hearing finding of probable cause precludes relitigation of probable cause here. He instead insists that probable cause is not a "total defense to false arrest and imprisonment" claims. (Objs. at 14.) But as the Magistrate Judge noted (see R. & R. at 12), the Ninth Circuit has repeatedly held the opposite. See Yousefian v. City of Glendale, 779 F.3d 1010, 1014 (9th Cir. 2015) ("The absence of probable cause is a necessary element of [a] § 1983 false arrest" claim); Hart v. Parks, 450 F.3d 1059, 1069 (9th Cir. 2006) ("Because police had probable cause to arrest him, [plaintiff's] false arrest claim necessarily fails."); Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998) (per curiam) ("To prevail on his § 1983 claim for false arrest and imprisonment, [plaintiff] would have to demonstrate that there was no probable cause to arrest him.").

Plaintiff claims, again, that Morrison "testified she never" told arresting officers Mirzoyan and Ramos that Plaintiff "contacted her in May 2016 and asked if he could move in with her in [California] temporarily to attend school." (Objs. at 3; see also id. at 4-5, 7, 19, 21-23.) As the Magistrate Judge noted

2

(see R. & R. at 7 n.5, 25-26), however, that's not true, and Plaintiff points to nothing in the record to the contrary. Indeed, at the preliminary hearing, Morrison testified that after Plaintiff called and "said he was coming out to California," she "offered to let him stay with [her] for a couple of months." (Pl.'s Statement Genuine Disputes, Ex. 2 at 9.)  At the time, she was living alone.  (See id.)  When Plaintiff arrived in California, they leased a different residence together.  (See id. at 10; id., Ex. 3 at 42, 48; id., Ex. 12 at 20-21.)

At Plaintiff's criminal trial, Morrison was testifying about that leased residence when she seemed to deny that he had told her that he was moving in with her temporarily:

> Q    And you needed [Plaintiff] to cosign for the apartment because he had good credit and you did not.
>
> A    No.  He -- he was moving in with me.  We both had to sign it.
>
> Q    Now, didn't [Plaintiff] tell you that he was moving in with you temporarily to help you get on your feet but then he was going to move out on his own?
>
> A    No.  It was -- we signed a year's lease.

(Id., Ex. 3 at 47.)  Contrary to Plaintiff's argument (see Objs. at 3-4), this testimony wasn't in the context of what she told Defendants leading up to Plaintiff's arrest; that came later (see Pl.'s Statement Genuine Disputes, Ex. 3 at 65-68).  She never denied having told Defendants around the time of his arrest that she had agreed to let Plaintiff move in with her temporarily (see R. & R. at 7 n.5, 25-26); their evidence on that point therefore

remains undisputed (see Defs.' Mot. Summ. J., Ex. 8, Mirzoyan Decl. ¶ 8; id., Ex. 2 at 2-3).[1]

Next, Plaintiff challenges the Magistrate Judge's finding that Ramos and Mirzoyan had to act fast because Morrison seemed to be in harm's way. (See Objs. at 6-7.) He claims Morrison went to the police station "only to drop off paperwork," not to "report a crime or seek police action." (Objs. at 7; see id. at 25.) Thus, he argues, she didn't "fear[] for [her] safety." (Id. at 7; see id. at 25 (claiming that Morrison "was not in fear for her safety" because "[s]he was not [at the police station] to make a report or seek police action").)

But the "paperwork" Morrison dropped off was a medical report showing that she had suffered rib fractures the day she called police and stating that she had "[ch]est pain after assault." (Pl.'s Statement Undisputed Facts, Ex. 5 at 3.) What's more, Mirzoyan declared that Morrison said she believed Plaintiff's threats were credible and that she "feared for her safety." (Defs.' Mot. Summ. J., Ex. 8, Mirzoyan Decl. ¶ 11; see also Pl.'s Statement Genuine Disputes, Ex. 10 at 37 (Ramos testifying that Morrison "expressed being . . . afraid").). And she told them that Plaintiff had thrown items around the house, including a 20-inch television, and struck her with a walker, which was consistent with what responding officer Avila saw when

---

[1] Plaintiff likewise claims that Ramos and Mirzoyan knew he "paid rent and was on [the] lease" (Objs. at 37; see also id. at 8-9, 32) and that Morrison told them that he "paid money towards [the] apartment" (id. at 45), but he cites no evidence supporting those claims. (See R. & R. at 25.) In any event, all that matters is what Ramos and Mirzoyan believed at the time of his arrest, not what they might have learned later.

4

she first entered the apartment.  (See R. & R. at 13, 15-16 (citing record evidence).)[2]  Indeed, Morrison later told Boylls that she had "[f]ear[ed] that [Plaintiff] would be at her residence" and therefore "responded to [the police station] and spoke with" Ramos and Mirzoyan there.  (Pl.'s Statement Undisputed Facts, Ex. 25 at 2; see also R. & R. at 31.)  She reported that she "live[d] in constant fear" of Plaintiff (Pl.'s Statement Undisputed Facts, Ex. 25 at 2) and requested a restraining order (id., Ex. 2 at 89-90).  Thus, Ramos and Mirzoyan would have reasonably believed that Morrison was in harm's way and had to act quickly.  (See R. & R. at 25.)

Plaintiff wrongly claims that "Avila testified nothing stopped her from arresting Plaintiff," and she could have "fil[ed] an arrest report."  (Objs. at 21; see also id. at 24 (arguing that Avila had "opportunity" to arrest Plaintiff).)  In fact, Avila couldn't arrest him because he was "already gone" when she "took the investigative report."  (Pl.'s Statement Genuine Disputes, Ex. 5 at 13; see Defs.' Mot. Summ. J., Ex. 1 at 3-4 (investigative report noting that Avila and her partner searched for but couldn't find Plaintiff).)

Arguing that Mirzoyan and Ramos should have investigated Morrison's claims more before arresting him, Plaintiff for the first time states that Morrison had falsely accused people

---

[2] In his Objections, Plaintiff for the first time "den[ies]" that Morrison "made these statements" to Mirzoyan and Ramos.  (Objs. at 20.)  Never mind that he previously didn't dispute those facts (see Pl.'s Statement Genuine Disputes at 7-8 (noting that they were "undisputed")), he has pointed to no contradictory evidence.  (See Defs.' Mot. Summ. J., Ex. 8, Mirzoyan Decl. ¶ 12 (Mirzoyan declaring what Morrison told them).)

5

before: she "has a long history of accusing people," "[m]ade many false police reports," and "filed complaints against many other people including judges, lawyers, medical doctors, psychologists, school teachers and principles [sic] and family members and more." (Objs. at 25-26.) Even if that's true, however, nothing suggests that Defendants had reason to so suspect, and because of Morrison's apparent injuries at Plaintiff's hands, they had to act quickly. They had no immediate basis to doubt Morrison's veracity, as the Magistrate Judge found. (See R. & R. at 16-17)

    Plaintiff's next argument fares even worse: because Mirzoyan allegedly testified that he entered the residence only to investigate, he must have lied in his declaration about Morrison giving him consent to enter to arrest Plaintiff. (See Objs. at 9.) As the Magistrate Judge noted (see R. & R. at 26 n.18), Mirzoyan never testified that he entered the residence only to investigate. But even if he did, that wouldn't mean that Morrison didn't consent to their entry to arrest Plaintiff. Indeed, she affirmatively told police that she wanted Plaintiff arrested (see Defs.' Mot. Summ. J., Ex. 8, Mirzoyan Decl. ¶ 13; see also id., Ex. 1 (investigative report noting that Morrison told Avila that she "want[ed]" Plaintiff "prosecuted for th[e] crime")), so when she brought them to the apartment and used her key to open the door and let them in, the officers would have reasonably inferred that she did so so that they could arrest Plaintiff.

    Ramos testified, Plaintiff asserts, "that there were no facts known to hi[m] that suggested . . . Morrison had any access, mutual use or control over the bedroom with Plaintiff."

6

(Objs. at 38.)  But as with all his objections, he doesn't supply supporting record citations, and the Court has found no such testimony.  Indeed, Morrison repeatedly referred to the apartment as hers and told the officers that Plaintiff was supposed to stay with her for a short time.  (See Defs.' Mot. Summ. J., Ex. 8, Mirzoyan Decl. ¶¶ 8, 11, 13; id., Ex. 2 at 2-3.)  As the Magistrate Judge correctly noted, no facts known to Ramos and Mirzoyan suggested that Plaintiff had "exclusive control" over the room.  (See R. & R. at 29; see also id. at 24-25.)

Finally, as to qualified immunity, Plaintiff again discusses United States v. Whitfield, 939 F.2d 1071, 1073, 1075 (D.C. Cir. 1991), stating that it's "nearly identical" to his case.  (Objs. at 43.)  But as the Magistrate Judge found, no Supreme Court or Ninth Circuit case as of November 2016 held that a parent's consent "prevails (or doesn't prevail) over a present and objecting adult child."  (R. & R. at 28.)  And even if Whitfield is "nearly identical" (Objs. at 43), it certainly doesn't reflect a "robust consensus" of persuasive authority, Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589-90 (2018) ("clearly established" means "dictated by 'controlling authority'" or supported by "robust consensus" of "persuasive authority" (citation omitted)).  (See R. & R. at 28-29 (summarizing cases disagreeing with Whitfield)); see also In re D.C., 188 Cal. App. 4th 978, 987 (2010) (observing that Whitfield "does not reflect a clear federal consensus").  Thus, the Magistrate Judge correctly found that Mirzoyan and Ramos were entitled to qualified immunity on Plaintiff's Fourth Amendment claim: they had no "fair and clear warning of what the Constitution requires."  City & Cnty. of S.F.

v. Sheehan, 575 U.S. 600, 617 (2015) (citation omitted).

The Court accepts the findings and recommendations of the Magistrate Judge. It therefore is ORDERED that Defendants' motion for summary judgment is GRANTED in part and Plaintiff's summary-judgment motion is DENIED. Judgment is to be entered in Defendants' favor, dismissing this action with prejudice as to Plaintiff's federal claims and without prejudice as to his state-law claims.

DATED: June 21, 2022

JESUS G. BERNAL
U.S. DISTRICT JUDGE